UNITED STATES of America, by Nicholas deB. KATZENBACH, Attorney General of the United States

v.

Houston JORDAN; Waver Jordan; T. B. Sumrall; John Warren Sumrall; Gilbert W. Landry; and Landry's Private Dining Club, Inc.

Civ. A. No. 15792.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 30, 1969.

John Bingler, Jr., Atty., Dept. of Justice, Washington, D. C., for United States.

Henry N. Richardson, Bogalusa, La:, for Gilbert W. Landry and Landry's Private Dining Club, Inc.

HEEBE, District Judge:

Does the mere conversion of a public restaurant into a "private club", which, in effect, is open to the white public, constitute a "pattern or practice of resistance to the full enjoyment of any of the rights secured" by Title II of the Civil Rights Act of 1964 warranting action by the Attorney General under § 206(a) of that Act, 42 U.S.C. § 2000a–5(a)? This is the most substantial question presented for our determination in this lawsuit. In addition, we must determine whether the defendant herein is a place of public accommodation or is a private club or other establishment not in fact open to the public.

This action was filed on July 19, 1965, by the United States Attorney General under the public accommodations title of the Civil Rights Act of 1964, Title II. The provisions of Title II secure to Negroes equal access to and equal treatment in places of public accommodation. Under § 206(a) of the Act, 42 U.S.C. § 2000a–5(a), the Attorney General may bring a civil action for "such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order * * * as he deems necessary to insure the full enjoyment of the rights herein described" whenever he has "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title II. The complaint, as amended in January 1966, alleges that Gilbert W. Landry and Landry's Private Club, Inc., have engaged in a pattern or practice of resistance to the full enjoyment by Negroes of rights secured to them by Title II.[1] The defendants, Landry's Private Dining Club, Inc. and Gilbert W. Landry, assert that they are exempt under § 201(e) of the Act, 42 U.S.C. § 2000a(e), which provides in pertinent part: "The provisions of [Title II] shall not apply to a private club or other establishment not in fact open to the public."

In a pre-trial order the parties entered into a stipulation with respect to most of the facts involved, which shortened the trial to a single day and considerably eased the Court's task of resolving the factual issues herein. The matter was taken under advisement after oral argument, but further correspondence from both sides and a detailed memorandum by counsel for the defendants have been received since the date of submission.

Prior to April 1965 the eating establishment, which is now owned by the defendant "club" and which is located in Bogalusa, Louisiana, was owned and operated by Gilbert W. Landry and was known as Landry's Fine Foods Restaurant. The establishment was a typical restaurant open to the general public, serving primarily seafood and meat dishes to customers from a standard menu form. The restaurant was staffed with an average of nine employees and was open Monday through Saturday between 10:30 A.M. and 10:00 P.M. Gilbert W. Landry owned the restaurant equipment and supplies used in operating the restaurant but the premises, together with the portion of the building used by Landry and his family as living quarters, were leased from Mr. George

---

1. This suit was originally brought against all of the named individual defendants. Houston Jordan is the owner and Waver Jordan is the manager of a restaurant known as the Thomas Sisters Cafe located in Bogalusa, Louisiana. T. B. Sumrall is the owner of a restaurant known as the Virginia Inn located in Bogalusa, Louisiana. John Warren Sumrall is the son of T. B. Sumrall and owns a service station known as John's Gulf Service Station located directly adjacent to the Virginia Inn in Bogalusa. Gilbert W. Landry was the owner and operator of a restaurant known as Landry's Fine Foods located in Bogalusa, Louisiana. The complaint was later amended to include Landry's Private Dining Club, Inc., as a party defendant in view of the fact that it was formed to take over the operations of Landry's Fine Foods. The government later dismissed its actions against the Jordans and Sumralls when they indicated their intentions to comply with Title II of the Civil Rights Act of 1964.

Klotzbach. The restaurant advertised by means of one highway road sign, several signs on the building in which the restaurant was located, and by sponsoring a ladies' bowling team which wore shirts lettered "Landry's Fine Foods."

Prior to February 1965 no Negroes had ever sought service at Landry's Fine Foods Restaurant. On three different occasions during that month, however, Negroes sought and received service at the restaurant. Troublesome racial incidents accompanied these occasions. The events are fully described in the stipulation:

"Sometime around the beginning of February 1965, and again on February 10, 1965, Negroes entered Landry's Restaurant and were served.

"On Thursday, February 11, 1965, Landry's Restaurant was picketed by white persons carrying signs reading, 'Landry Peacefully Integrated.' Mr. Landry called the Mayor of Bogalusa, Mr. Jesse Cutrer, on the 11th and asked for help. The mayor advised that the city could do nothing to help unless Landry brought charges against the pickets. Landry did not bring charges; he could not identify the pickets. Mr. Landry closed the restaurant between 2:30 and 3:00 p.m. on the 11th in order to keep down trouble. His customary closing hour was 10:00 p.m. at that time.

"Mr. Landry did not reopen his restaurant until Monday, February 15, 1965. His restaurant normally closed only on Sundays.

"On February 15, 1965, at approximately 9:20 p.m. a group of seven or eight Negroes entered Landry's Restaurant. After all the members of the Negro group took seats, Mrs. Susie Lee Landry, Mr. Landry's wife, approached the group. They said they only wanted coffee. At this point, Mr. Landry advised the Negroes that his establishment was a restaurant and not a coffee shop. Mrs. Landry gave each of the Negroes a glass of water and menus. Each of the Ne-groes ordered a hamburger. While the hamburgers were being grilled, two white men came into the restaurant. These men approached the Negroes, threatened them, and told them to get out. The group of Negroes got up and left the restaurant. The white customers who had been in the restaurant also left at this time. No other customers or persons entered the restaurant after this incident that evening, except a police officer who entered the restaurant looking for a purse which one of the Negroes had left in the restaurant. Mrs. Landry looked in the area where the Negroes had been seated and discovered a purse on the floor. She gave this purse to the police officer. Mr. and Mrs. Landry closed the restaurant at 9:50 p.m. that evening, because of their fear that additional trouble might take place.

"While the group of Negroes were in Landry's Restaurant, on February 15, 1965, at approximately 9:30 p.m., Mr. Landry called the mayor of Bogalusa, Mr. Jesse Cutrer. Many of the merchants in Bogalusa had met with the mayor and city counsel [sic] concerning racial incidents which had taken place in Bogalusa. Mr. Landry called the mayor to advise him of what was going on. Landry told the mayor that a number of Negroes had just entered his restaurant. He advised the mayor that, as the mayor knew, he had served Negroes at his restaurant during the previous week and the following day he was picketed by white persons with the result that he had to close his restaurant. Mr. Landry asked the mayor what he should do. Mr. Cutrer advised Landry that he was unable to do anything for him. Cutrer told Landry that he understood his problem, but was unable to solve the problem for him, or give him any advice."

From February 16, 1965, through March 31, 1965, no Negroes sought service at Landry's Fine Foods Restaurant. Gilbert W. Landry discontinued the op-

eration of Landry's Fine Foods Restaurant after the close of business on March 31, 1965. On April 7, 1965, Landry's Private Dining Club, Inc., was incorporated under the provisions of the Business Corporation Law of Louisiana. The incorporators were Gilbert Landry, who subscribed to 90 of the 100 shares of stock, his wife, Mrs. Susie Lee Landry, who subscribed to 9 shares of stock, and Allen T. Mathews, who subscribed to the remaining share. The shares are transferable, but the original incorporators still own their original shares, and no additional shares have been issued.

Gilbert W. Landry was chosen chairman of the incorporators at their only meeting at 4:00 p.m. on April 7, 1965. The incorporators resolved that a membership committee be created and established by the board of directors, Gilbert W. Landry, Mrs. Susie Lee Landry, and Allen T. Mathews elected themselves directors of the corporation.

The first meeting of the board of directors of Landry's Private Dining Club, Inc., was held on April 7, 1965, at 7:00 p.m. At this meeting Gilbert W. Landry was elected President of Landry's Private Dining Club, Inc., his wife, Mrs. Susie Lee Landry, was elected Secretary-Treasurer, and Allen T. Mathews was elected Vice-President. Gilbert W. Landry then subleased the restaurant premises to the new corporation and sold to it the restaurant equipment for which he received a 6% promissory note payable on demand which was executed by the corporation and secured by a chattel mortgage on the restaurant equipment. He also loaned the corporation $3,826, to be used as working capital, in return for a 6% promissory note of the new corporation. As a part of the transaction, Landry was employed as manager of the Club at a salary of $200 a month, and his wife was employed as assistant manager at a salary of $150 a month. Mr. and Mrs. Landry are still the manager and assistant manager, and they actively operate and manage the business. The directors also gave Gilbert W. Landry authority to transact any business, enter into any agreement or contracts, and make any arrangements necessary or incidental to the transaction of business of Landry's Private Dining Club, Inc., as well as the specific authority to establish a checking account in the name of the corporation and to write checks on the account with no other signature required.

On April 8, 1965, a key-card lock device was installed in the front door of the restaurant. Members are issued key cards which open the key-card lock. On April 8 and 9, 1965, an advertisement, measuring eight inches by five and one-half inches, appeared in the Bogalusa Daily News and read:

"Notice

To members of

Landry's Private

Dining Club Inc.

We will be open for business

Friday, April 9th

10:30 AM until

218 Alabama Avenue

(formerly known as Landry's Restaurant)"

For some time prior to March 31, 1965, Mr. Landry had maintained a prospective members "sign-up list" at his restaurant. Customers, except Negroes, whether they were known to Mr. Landry or not, were asked if they were interested in the restaurant becoming a club, and if they were, they were asked to sign their names and addresses on the prospective membership list. Approximately 1,200 persons signed the list expressing an interest in the formation of the club. None of the persons who signed the list were Negro. Sometime after the restaurant closed on March 31, 1965, but prior to April 9, 1965, Mr. Landry mailed out applications for membership forms to each of the persons who had signed the proposed membership list.

The board of directors met and established a membership committee on April 9, 1965. The committee was composed

of the members of the board of directors —Gilbert W. Landry, Mrs. Landry and Allen T. Mathews. These persons have constituted the membership committee from that date to the present.

The facilities and services of Landry's Private Dining Club, Inc., have been available only to members of the corporation and their guests since the "club" began operations on April 9, 1965. Guests may use the "club's" facilities and services only when accompanied by a member.

When the "club" opened for business on April 9, 1965, and for a period of 7 to 14 days thereafter, the membership committee was present at the restaurant. When persons came to the door of the "club", the door would be opened and applicants for membership could fill out an application card or turn in the one which had been mailed to them, pay their dues, and receive a membership card which a typist would prepare while they waited. They could then use the "club's" facilities. Approximately 988 persons became members of Landry's Private Dining Club, Inc., between April 9, 1965, and April 23, 1965. No one who applied for membership prior to April 23, 1965, was rejected.

The membership committee met on April 11, 1965, and elected Gilbert W. Landry permanent chairman, Mr. Mathews vice chairman, and Mrs. Landry secretary. Various rules and regulations were adopted. The committee also formally ratified the membership application form, the establishment of the initial annual membership fee of two dollars, the establishment of the policy of all applications for membership being reviewed informally by at least two members of the membership committee, and the establishment of the policy of making the first 1,000 persons admitted to membership charter members, all of which had been informally agreed upon and placed into operation at the "club's" opening on April 9, 1965. The committee also formally ratified its informal action over the prior two days of accepting members.

The facilities used in the operation of Landry's Private Dining Club, Inc., are substantially the same as the facilities used in the operation of Landry's Fine Foods Restaurant except that in July 1965, a bar and lounge facilities were installed by the "club" in a room on its premises which had formerly been used by a radio station. The "club" has employed an average of about eight persons as compared to the average of about nine persons employed by Landry's Fine Foods Restaurant. Since its opening the "club" has operated on the same days and during the same hours as Landry's Restaurant had operated except that from approximately July 1, 1965, to October 1, 1965, it was in operation on Tuesday through Sunday of each week. On April 9, 1965, the signs on the front of the premises were changed to indicate that the premises were occupied by the "club". The sign on the side of the premises and the sign on the highway were defaced a few days after April 9, 1965, although the sign on the side of the building now reads "Landry's ————urant." The old bowling shirts were discarded and new shirts lettered "Landry's Private Dining Club, Inc.," were purchased at the "club's" expense. Finally, the "club" extends all of its goods and services for cash rather than credit. No credit is available.

No Negroes are, or have ever been, members of Landry's Private Dining Club, Inc. No Negroes have ever been served at Landry's Private Dining Club, Inc., as guests of members of the "club." On July 20, 1965, at about 12:40 P.M., a group of five Negroes, three males and two females, attempted to gain entrance to Landry's Private Dining Club, Inc. One of the Negro males attempted to open the front door but found it locked.

 The parties stipulated that a substantial portion of the food which the corporation serves has moved in interstate commerce. Thus, Landry's Private Dining Club, Inc., is clearly within the ambit of Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a(c) (2). We

turn then to the first question of whether Landry's Private Dining Club, Inc., is exempted from the provisions of Title II by the private club exemption found in § 201(e) of the Act, 42 U.S.C. § 2000a(e). It is well settled that the defendant bears the burden of establishing his exempt status, United States v. Richberg, 398 F.2d 523 (5th Cir. 1968); Nesmith v. Young Men's Christian Ass'n of Raleigh, N. C., 397 F.2d 96 (4th Cir. 1968); Kyles v. Paul, 263 F.Supp. 412 (E.D. Ark. 1967), aff'd sub nom., Daniel v. Paul, 395 F.2d 118 (8th Cir. 1968), rev'd on other grounds, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (June 2, 1969), and we easily conclude that Landry's Private Dining Club, Inc., is not a private club exempted from coverage under the Act.

Whether an establishment is open to the public or is a "private club" is, of course, a factual determination. The government's brief contains an excellent analysis of the relevant inquiries based upon the legislative history of the Act and the cases decided thereunder. We adopt that analysis as follows:

"Summarizing the legislative history and the cases, the factors bearing on the factual question presented by Section 201(e) can be divided into several broad categories. First, and of primary importance, are the factors which go to determining whether the 'membership is genuinely selective on some reasonable basis.' Within this broad category the factors which are relevant are:

"(1) Whether the existing members have any control over the admission of applicants for membership, e.g., whether there is a membership committee selected by the members to represent them, whether there is a blackball system by which individual members can reject an applicant even though he might have been recommended by another member, whether notice of pending applications is given to existing members, whether existing members are notified after an applicant has been admitted;

"(2) Whether the existing members have any control over the revocation of membership of other members, e.g., whether there is a committee selected by the membership to represent them on this question, whether any notice is given the members on pending or recent revocations;

"(3) Whether the recommendations of existing members are required on applications;

"(4) Whether the number of members is limited in any way other than by the capacity of the facilities; here the number of members can be considered, particularly as this number relates to the population, the area or group from which members are drawn;

"(5) Whether there are any genuine qualifications for membership, e.g., residence in a particular location, position in a particular social or economic class, good reputation or character; here the following considerations are relevant: The number of applicants rejected as compared to the number accepted; the extent to which applicants are investigated prior to admission; whether references are required on application forms to aid in any such investigation; the existence of a delay between application and approval during which such investigation could be made; the number of revocations of membership as compared to the number of members.

"A second broad category of factors are those bearing on the question of who controls the operations of the establishment. Within this category the factors are:

"(1) Whether the members exercise control over the operations of the establishment and to what extent, e. g., do they own any of

the property, do they determine where the revenues from the establishment's operations will be used; or are these revenues retained by the establishment's manager;

"(2) Whether control changed hands at all when the establishment became a membership corporation.

"A third category bears on the manner in which the membership corporation was created, e. g., were the customers of the establishment which preceded incorporation solicited to become members when the corporation was formed, or warned of impending incorporation; was advertising done when the corporation was formed to solicit members;

"A fourth category bears on the purpose of the membership corporation for existing. Considerations might include:

"(1) Whether the corporation has a civic, fraternal, or social purpose;

"(2) Whether any alleged purposes, such as keeping undesirable characters out of the establishment, could be accomplished without resort to the membership corporation device;

"(3) Whether any rights or obligations flow from membership which were not possessed by customers of the establishment before it became a membership corporation, e. g., whether the members are bound to abide by any Bylaws or Rules.

"A fifth category focuses on the formalities which many private clubs observe, for example:

"(1) Are there any documented Articles or Bylaws or Rules;

"(2) Are there any formalized procedures for becoming a member of the corporation, e. g., application forms, initiation ceremonies;

"(3) Are there any formalized expulsion procedures, e. g., the right to a hearing before an expelling committee;

"(4) Are there membership cards;

"(5) Is there a roster of members;

"(6) Are there established procedures for permitting guests of members to use the establishment's facilities.

"The sixth and final category of relevant factors takes into consideration the general characteristics which many private clubs possess, for example:

"(1) Does the establishment advertise;

"(2) Does it have a listing in the classified section of the telephone directory, and if so, under what heading does this listing appear;

"(3) Does it take advantage of the alternate licensing and tax exemption provisions available to private clubs;

"(4) Are there both dues and initiation fees, and

"(5) Is payment for services received at the establishment on a cash or credit basis.

"The cases reviewed above and the legislative history of Section 201(e) show that the above listing of categories is arranged in the order of relative importance to the 201(e) question. The core factors which determine whether an establishment 'serves the public,' or is 'a private club or other establishment not in fact open to the public' are the extent to which the membership is 'genuinely selective on some reasonable basis' and the measure of control the members have over the operations of the establishment. The factors listed under categories three through six are relevant only in that they are generally manifested by membership corporations which are 'in fact' private because they meet the requirements inherent

in the first two categories." Government's Brief, pp. 23–27.

The factors relied upon in the decisions which we have examined fully support this analysis. Stout v. Young Men's Christian Association of Bessemer, Alabama, 404 F.2d 687 (5th Cir. 1968); United States v. Richberg, 398 F.2d 523 (5th Cir. 1968); Nesmith v. Young Men's Christian Association of Raleigh, N. C., 397 F.2d 96 (4th Cir. 1968); Kyles v. Paul, 263 F.Supp. 412 E.D.Ark.1967), aff'd sub nom., Daniel v. Paul, 395 F.2d 118 (8th Cir. 1968), rev'd on other grounds, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (June 2, 1969); United States by Katzenbach v. Jack Sabin's Private Club, 265 F.Supp. 90 (E.D.La.1967); United States v. Northwest Louisiana Restaurant Club, 256 F.Supp. 151 (W.D.La.1966); Williams v. Rescue Fire Co., 254 F.Supp. 556 (D.Md.1966); United States v. Clarksdale King & Anderson Co., 288 F. Supp. 792 (N.D.Miss.1965); Bradshaw v. Whigham, 11 Race Rel.Rep. 934 (S.D. Fla.1964).

Landry's Private Club has adhered to a number of formalities followed by private clubs. It has adopted by-laws, established rules and regulations to govern membership, issues membership cards, maintains a roster of members, assesses a $5.00 initiation fee and $5.00 annual dues. In spite of adherence to these formalities, it is clear from an analysis of the facts that the "club" is not a bona fide private club within the meaning of the Civil Rights Act. We consider first the factors within the first broad category.

Existing members have no control over the admission of applicants for membership. This determination is made solely by the membership committee composed of Mr. and Mrs. Landry and Mr. Mathews, and the vote of only two of the three members is necessary. Members have no right to blackball any applicant for membership. In fact, members are not even notified of pending applications for membership nor are they notified of the acceptance of any applicant into membership. Likewise, existing members have no control over the revocation of membership of other members. Members do not even receive notice of pending revocations. Although the rules and regulations provide for a hearing prior to the revocation of any membership, membership is revoked in practice by Mr. Landry at the time of the disturbance.

Originally, applicants did not need the recommendation of an existing member. Since June 1, 1965, this has been a requirement. At that time, however, about 1,600 persons were members of the "club"; hence, in view of the white population of Bogalusa, it is far from difficult for any white person desiring membership to obtain the necessary recommendation. The purpose for adding the recommendation requirement was to "put the brakes on" since the size of the membership was getting too big for the "club" to handle. There are no limits on the size of membership other than the limits inherent in the physical capacity of the facilities.

The only qualification for membership, other than race, is that a person not be a known troublemaker. Otherwise, any white person is eligible for membership. In the first year and few months of operation, not one of the 2,400 applicants for membership was rejected. Applicants are not investigated prior to acceptance. They need only be known by the Landrys or by someone known by the Landrys. References are not required. There is often a one or two week delay between application for membership and acceptance, but this is due to the fact that the typist who prepares the membership cards only comes in once every one or two weeks. Since the inception of the "club", only about half a dozen members have been expelled and some of those have been reinstated.

In view of the foregoing factors, it can hardly be said that membership is genuinely selective on some reasonable basis. Any white person, excepting known troublemakers, is eligible for membership.

Turning to the factors to be considered within the second category, it is obvious that members have no control over the "club's" operations. The members do not own any of the "club's" property. It is owned by the Landrys through the corporation. The members have no voice in the operation of the facilities. All decisions are made by Mr. Landry. He, of course, often informally consults with the members before making any innovations, just as any good proprietor would seek the advice of his customers to determine the reception a particular innovation would have. The "club" is operated for profit and all profits are retained by the Landrys. The Landrys retained control when the restaurant was incorporated. It is also significant that no payments on principal or interest have been made on the notes given by the corporation to the Landrys for the assets of the restaurant.

The foregoing factors demonstrate that the "club" does not meet the qualitative criteria of a bona fide private club within the meaning of the Civil Rights Act of 1964. The "club" does not even satisfy all of the formalities observed by private clubs. As indicated previously, membership was solicited from the customers of the restaurant prior to incorporation. The purpose of the "club" is no different than the purpose of the restaurant which preceded it. Mr. Landry desired to keep out troublemakers and "riff-raff" but this could be accomplished just as easily when the establishment operated as an unincorporated restaurant.

Most of the factors in the fifth category are observed. But there are no formal initiation ceremonies and there is no hearing, in the general sense of that term, prior to expulsion. Moreover, even though the "club" does have bylaws and rules and regulations governing membership, the members are ignorant of the provisions contained therein. Further, no meetings of the "club's" membership have ever been held. With regard to the sixth category, advertising is minimal, as mentioned above, and members must pay both a $5.00 initiation fee and $5.00 annual dues. However, the "club" is listed under the "restaurants" section of the telephone book rather than the "clubs" section, does not take advantage of alternate licensing and tax exemption provisions available to private clubs, and, with the exception of Crown Zellerbach Corporation, members are not entitled to credit in using the "club's" facilities.

 It is clear that membership in Landry's Private Dining Club, Inc., is not genuinely selective on some reasonable basis and that the members have no control whatsoever over the establishment's operations. We conclude that Landry's Private Dining Club, Inc., is not a bona fide private club exempted from the coverage of Title II of the Civil Rights Act of 1964 under § 201(e), but rather is open to the general white public. That leaves for determination the question of whether the defendants have engaged in a pattern or practice of resistance to the full enjoyment by Negroes of rights secured to them by Title II.

Defendants would have us believe that the "club" was formed because Mr. Landry intended to install a bar and lounge, and it was necessary to form a private club to keep out the "riff-raff." By "riff-raff" Mr. Landry apparently had reference to persons who cause disturbances and disrupt the peaceful decorum of the establishment. However, as indicated above, it is not necessary to form a private club to keep troublemakers off the premises. Moreover, the LaPlaza Restaurant, located across the street from Landry's, serves mixed drinks and is open to the public. Yet, it is considered to be a very nice place. It is frequented by men with their families and has not been beset with the "riff-raff" so ardently feared by Mr. Landry.

Actually, from the testimony it is clear that the "club" was formed so that

Landry could keep operating the establishment. Mr. Landry was forced to close to keep down trouble due to the picketing which occurred when he served the Negroes who entered his restaurant. The only way he could stay in business was to form the "club". The dominant motive prompting the formation of the "club" was clearly to establish a device to exclude Negroes from the establishment.

The "club" device has been remarkably successful in accomplishing this objective. No Negroes have ever been admitted to the "club" as members or as guests. The only Negroes who have sought entrance into the establishment since it was incorporated were turned away by the locked door. Yet the door is at least opened for non-member white persons who seek admittance in the same way by employees on the inside who can see all persons who approach the outside door.

The discriminatory aspects of the defendants' conduct is obvious. The very purpose of the attempt to form a private club was to exclude Negroes from the enjoyment of the facilities, and Negroes have been effectively denied the enjoyment of the facilities. This clearly violates § 203 of the Act, 42 U.S.C. § 2000a–2. *Cf.*, United States v. Richberg, 398 F.2d 523 (5th Cir. 1968); Bradshaw v. Whigham, 11 Race Rel. Rep. 934 (S.D.Fla.1964); United States v. Northwest Louisiana Restaurant Club, 256 F.Supp. 151 (W.D.La.1966), wherein the three-judge district court stated:

> "The *natural consequence* of the formation and operation of the Northwest Louisiana Restaurant Club has been to discourage and deter Negroes from attempting to obtain service at the member restaurants, and it was the intent and purpose of the members of the Club to accomplish such

discouragement and deterrence." At 153. (emphasis supplied)

The sole remaining question is whether the facts warrant the maintenance of this suit by the Attorney General.

"In light of the overriding purpose of Title II 'to move the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public,' " [2] we do not read the "pattern or practice" provision before us "with narrowed eye but with open minds attuned to the clear and strong purpose of the Act." [3] We hold that the conversion of a public restaurant into a "private club", which is open to the general white public and not within the exemption of § 201(e), when done, as here, for the purpose of excluding Negroes, constitutes a pattern or practice of resistance to the full enjoyment of rights secured by Title II within the meaning of § 206(a) authorizing suit by the Attorney General. The formation of this "club" was far from a mere isolated instance of discrimination. Rather, it was the calculated expression of a continuing and pervasive policy of the owners and those white persons who became members of the "club" to deter and discourage the use of the restaurant by Negroes. It was far more effective, and in some respects more harmful, than the denial of service to Negroes in a number of isolated instances. Although it was not in itself an immediate and direct denial of service, the creation of the "club" was of broader scope, designed to curtail at the very inception any possible attempt by Negroes to enjoy the facilities of the restaurant. The broad scope and continuous nature of this single act most surely constitutes a "pattern or practice" of discrimination. To hold otherwise would exempt the most effective acts of discrimination, and place a premium on the most pervasive policies of discrimination.

---

2. Daniel v. Paul, 395 U.S. 307, 89 S.Ct. 1702 (June 2, 1969).

3. Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 349 (5th Cir. 1968).

## ORDER

Therefore, and pursuant to the foregoing opinion of the Court, IT IS THE ORDER OF THE COURT that the defendant Landry's Private Dining Club, Inc., its agents, officers, employees, members, servants and their respective successors, and all those in active concert and participation with them or any of them, be, and they are hereby, ENJOINED from:

1—withholding, denying, or attempting to withhold or deny to anyone, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Landry's Private Dining Club, Inc., on the ground of race, color, religion or national origin;

2—engaging in any other act or practice which may tend to hinder or interfere with the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of Landry's Private Dining Club, Inc., by any person on the ground of race, color, religion or national origin;

3—refusing to admit any person to the facilities and services of Landry's Private Dining Club, Inc., or withholding or denying to any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of Landry's Private Dining Club, Inc., on the ground that said person is not a member of the said Club or does not possess a membership card;

4—requiring any person to become a member of Landry's Private Dining Club, Inc., in order for said person to obtain the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of Landry's Private Dining Club, Inc.; and

5—making representations to the public by general advertisements, or in any other manner, that the services and facilities of the defendant are those of a private club, or other establishment not in fact open to the public.

IT IS THE FURTHER ORDER OF THE COURT that this Court retain jurisdiction of the subject matter of this cause and of the parties hereto for the purpose of enforcing this injunction from time to time as such action may be deemed necessary or desirable.