James A. DURHAM, Plaintiff,

v.

**RED LAKE FISHING AND HUNTING CLUB, INC., Defendant.**

**Civ. A. No. W–83–CA–95.**

United States District Court,
W.D. Texas,
Waco Division.

Aug. 25, 1987.

---

Patrick J. Gilpin, Patrick J. Gilpin & Associates, Houston, Tex., for plaintiff.

J. Val Fulcher, Keils & Fulcher, Teague, Tex., Noley R. Bice, Jr., Fulbright, Winniford, Bice & Marable, Waco, Tex., for defendant.

## FINDING OF FACT AND CONCLUSIONS OF LAW

WALTER S. SMITH, Jr., District Judge.

On the 26th day of May, 1987, this cause came on to be heard by the Court. Having considered the pleadings, the evidence, and the arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Plaintiff, James A. Durham, a black male, brings this cause of action under the civil rights laws dealing with racial discrimination in public accommodations and fair housing, specifically pursuant to 42 U.S.C. Sections 1981, 1982, 1985(3), 1986, 1988, 2000a *et seq.*, 3601 *et seq.* Additionally Plaintiff brings this cause of action under pendent jurisdiction for a claim under Texas common law for mental anguish.

Prior to trial, the Court dismissed individual Defendants, Ernest Swank, James Callaway, Warren D. Awalt, Sr., J.R. Corne, Eleanor Swank, R.M. Vandiver, R.D. Doyle, Don Craft, Jr., Clinton Crass, Jack Albright, James C. Giles, and Tom Bonner, Jr. Before Plaintiff rested Defendants Earline Swain, d/b/a Dogwood Realty, and individually, and Diane Daniel, d/b/a Dogwood Realty, and individually, were dismissed by stipulation. The dismissal of all Defendants but Red Lake Fishing and Hunting Club, Inc. renders claims under Sections 1985(3) and 1986 moot.

Red Lake Fishing and Hunting Club, Inc. ("Club"), originally organized in 1938, was formally incorporated as a non-profit recreational club under the laws of Texas in 1939. Subsequent to the incorporation, the Club acquired approximately 400 acres of land in Freestone County, Texas. The principal purpose of the Club, as stated in its original charter and its 1979 restated articles of incorporation, was to establish and maintain a fishing, hunting and boating club and to engage in the conservation of wild life and to purchase and own land and bodies of water necessary to accomplish this purpose. The corporation owns all fee title interest in the property, including the lake. A member of the Club is entitled to make improvements to a lot designated for his or her use. The member making the improvement owns such improvements and may sell them to a new member of the Club, or may remove them upon termination of the membership. Currently, Club facilities cover approximately 400 acres with sixteen permanent residents and more than seventy buildings.

Dues are collected yearly from each member to be used for the maintenance of the club facilities and property and the payment of appropriate taxes.

Membership to the Club is limited to eighty members. The procedure for membership includes an application and fee, recommendation by a membership committee, and voting by all members of the Club. Any applicant who receives five or more negative votes will be rejected. The Club has never had a black member.

In the present case Plaintiff James A. Durham agreed to purchase the membership of Club member H.C. Daniel, who is white, in the fall of 1982. Plaintiff would be entitled to use of a specific plot of land and the improvements of such land. H.C. Daniel wrote a letter to the Club requesting a transfer of his membership, share 180, to Plaintiff and highly recommended him for membership. Plaintiff subsequently applied for membership to the Club and was recommended for membership without reservation by the Club's membership committee. Plaintiff was the first black to apply for membership in the Club. On September 14, 1982, a letter was sent by the Secretary of the Club informing members of the dates for voting on the application of James A. Durham. In the letter, Plaintiff was referred to as "the son of Walter Durham of Route 2, Fairfield, Texas." Walter Durham worked for the Club since the Club's inception in 1938, and was known to be black. After the voting concluded, the counting of the ballots showed that Plaintiff received more than five negative votes and was, therefore, rejected for membership. In January, 1983, Plaintiff resubmitted his application. Again, Plaintiff received more than five negative votes and was rejected for membership. The only justification given by three board members as to their "no" votes was a concern that Plaintiff would bring too many family members to the Club. There is no limit to the number of guests a member may bring to the Club. Others could not explain why they voted "no." From the Club's inception, only two white applicants have been rejected for membership. The first, Mace Daniel, had violated the Club's rules while visiting as a guest by staying longer than the requisite period and by shooting at and destroying some Club property during target practice. The second, Jim Sanders, was a member of the leadership of the local Jehovah's Witness Church who moved to the area in the late 1960's for the purposes of integrating the racially separate black and white Jehovah's Witnesses Churches. At least five new white members were admitted to the Club during the period in which Plaintiff applied, being admitted with zero negative votes. One white member was admitted with three negative votes.

## Conclusions of Law

### Discrimination

■ Courts have consistently held that a Plaintiff establishes a *prima facie* case under either 42 U.S.C. §§ 1981, 1982 or 42 U.S.C. § 3601 *et seq.* by proving:

(1) That he or she is a member of a racial minority;

(2) That he or she applied for and was qualified to rent or purchase certain property or housing;

(3) That he or she was rejected; and

(4) That the housing or rental property remained available thereafter.

*Selden Apartments v. United States Department of Housing and Urban Development,* 785 F.2d 152, 159 (6th Cir.1986). In the present case, Plaintiff James A. Durham is a member of a racial minority, black. Durham applied for and was qualified for H.C. Daniel's membership share number 180, which included use of a specific plot of land on the Club's property and the improvements thereon. Plaintiff was rejected for membership twice and the property remained available thereafter.

Defendant may overcome this *prima facie* showing of discriminatory intent by articulating some legitimate non-discriminatory reason for the Plaintiff's rejection. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Three board members of the Club testified that they voted to reject Plaintiff because there was a concern that Plaintiff would bring too many family members as guests to the Club. Plaintiff's father, Walter Durham, lived on property adjoining the Club. Whenever Plaintiff's family gathered at his father's house, there was a large number of people since Walter Durham had nine children. The three board members testified that frequently they observed large numbers of family and friends gathered at Walter Durham's property. Others who testified that they voted to reject Plaintiff's application could not explain why they voted "no." No evidence was presented that the Club had a limit on the number of guests that a member could bring to the Club. The Club limited its membership to eighty persons, but not the number of guests. Once the Defendant articulates a non-discriminatory reason for the Plaintiff's rejection, the Plaintiff bears the ultimate burden of persuasion as to whether the Plaintiff has been the victim of intentional discrimination. This burden may be met in one of two ways as stated in *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). First, a Plaintiff may persuade the Court that the decision to reject was more likely than not motivated by a discriminatory reason. Second, the burden is also satisfied if the Plaintiff shows that the "proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) citing *McDonnell Douglas,* 411 U.S., at 804–805, 93 S.Ct. at 1825–1826. The Court finds that the explanation given by the three board members is unworthy of credence and that Plaintiff's rejection was more likely than not motivated by a discriminatory reason. The fact that Plaintiff may bring a large number of family members as guests to the Club may only support further discriminatory intent by the Club since Plaintiff's family members are black. Further, guests are limited as to the number of days allowed in the Club each year which would preclude Plaintiff from having his entire family at the Club at all times.

The Plaintiff may also meet the burden of persuasion by showing direct and indirect evidence as to intent. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In the Club's almost fifty year history only two whites have been rejected for membership. One had violated Club policy by staying longer than twenty-eight days as allowed per guest each year and by shooting and destroying Club property during target practice. The other was a member of a Jehovah's Witness Church who was involved in integrating black and white Jehovah's Witness Churches. All other white applicants were accepted. Plaintiff met all of the qualifications for membership and was rejected by a large number of votes. Also, the letter that was sent to each member informing them of the dates for voting on the Plaintiff's application stated that Plaintiff was the son of Walter Durham, who was known by members since he worked for the Club since its inception in 1938. Members would have no problem directly connecting Plaintiff to his race. For the reasons stated above, the Court

finds that Plaintiff was denied membership in the Club because of Plaintiff's race, black.

*Private Club Exemption*

■ Having found that the Club has discriminated against Plaintiff on the basis of race, the Court must next examine whether the Club falls under the private club exemption as set forth in Title II of the Civil Rights Act of 1964 and codified under 42 U.S.C. § 2000a.[1] First, the Court must address the issue of whether the private club exemption is applicable to 42 U.S.C. § 1981[2] and § 1982[3] claims. The Supreme Court has never held whether truly private organizations are outside the scope of § 1981 and § 1982. In three separate decisions the Supreme Court has found it unnecessary to decide the issue by finding that the organization was not truly private. *Runyon v. McCrary*, 427 U.S. 160, 172 n. 10, 96 S.Ct. 2586, 2595, 49 L.Ed.2d 415 (1976); *Tillman v. Wheaton-Haven Recre-*

**1.** 42 U.S.C. § 2000a

(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to any such facility located on the premises of any retail establishment; or any gasoline station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

(c) The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b) of this section; (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, have moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, ath-letic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b) of this section, it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States or between the District of Columbia and any State, or between any foreign country or any territory or possession of any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

(e) The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section.

**2.** 42 U.S.C. § 1981

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**3.** 42 U.S.C. § 1982

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, pur-

*ation Association,* 410 U.S. 431, 438–39, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 236, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). Sections 1981 and 1982 are codifications of the Civil Rights Act of 1866. Section 2000a is a codification of the Civil Rights Act of 1964, which specifically exempted private clubs from discriminatory practices. The Supreme Court has yet to address whether a private club, exempt from coverage under the 1964 Act, is also exempt under the 1866 Act. This Court would decide that § 1981 and § 1982 are subject to the exemption were the Court not to find that the Red Lake Hunting & Fishing Club is not a truly private club. Based on the private club exemption, a "truly private club," i.e. one which is genuinely selective in its membership and meets the other tests of *United States v. Jordan,* 302 F.Supp. 370 (E.D.La.1969), (discussed *infra* ), does have the right to discriminate against potential members based on race; but clearly the *only* criteria for selection cannot be that one be white.

*Title II*

▮ Title 42 U.S.C. § 2000a ("Title II") provides that "all persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation." "Public accommodation" is defined in § 2000a(b) as an establishment which operations affect commerce. Section 2000a(b)(3) lists an example of a covered establishment as any "place of ... entertainment." Title II must be read so as to be liberally construed and broadly read. *United States v. DeRosier,* 473 F.2d 749, 751 (5th Cir.1973); *Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969). Courts have found places of enter-

tainment to include health and beauty spas[4], golf clubs[5], bars and package stores[6], swimming pools[7], and athletic clubs[8]. In the present case, the Club's primary purpose is for hunting, fishing and boating. The Court is of the opinion that these recreational activities at the Club place the Club under the definition of "place of entertainment" as applied to Title II. The Club also is a recreational club which affects commerce. For over twenty years the Club was engaged in interstate commerce by entering into oil and gas leases. Oil and gas are substances which move in interstate commerce. Several of the leases were still in effect at the time of Plaintiff's application for membership. During the period that Plaintiff applied for membership, the Club received approximately $60,000.00 per year from an oil lease. The Club also affected interstate commerce by allowing various members and guests to bring in boats, camping equipment and guns which had moved in interstate commerce.

The only exception to 42 U.S.C. § 2000a is the private club exemption. If the Club is found to be a truly private club, the Club can discriminate. "Private Club" has not been defined by statute or by the Supreme Court. However, various courts have developed standards and specific criteria to make this determination.

> In determining whether an establishment is in fact a private club, there is no single test. A number of variables must be examined in the light of the Act's clear purpose of protecting only the genuine privacy of private clubs whose membership is genuinely selective.

*Nesmith v. Y.M.C.A.,* 397 F.2d 96, 101–102 (4th Cir.1968). Each factor should be considered and either "tips the balance for or

---

chase, lease, sell, hold, and convey real and personal property.

4. *Rousseve v. Shape Spa for Health and Beauty, Inc.,* 516 F.2d 64 (5th Cir.1975) *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 461 (1976).

5. *Anderson v. Pass Christian Isles Golf Club, Inc.,* 488 F.2d 855 (5th Cir.1974); *United States v. Central Carolina Bank & Trust Co.,* 431 F.2d 972 (4th Cir.1970).

6. *United States v. Deyorio,* 473 F.2d 1041 (5th Cir.1973).

7. *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2nd Cir.1974).

8. *Smith v. Young Men's Christian Association of Montgomery, Inc.,* 462 F.2d 634 (5th Cir. 1972); *Nesmith v. Young Men's Christian Association of Raleigh, North Carolina,* 397 F.2d 96 (4th Cir. 1968).

against private club status." *Wright v. Cork Clubs*, 315 F.Supp. 1143, 1150 (S.D. Tex.1970).

The District Court in *United States v. Jordan*, 302 F.Supp. 370 (E.D.La.1969) provided six categories to consider when establishing the existence or lack thereof of a private club. The categories, in order of relative importance, are as follows:

(1) the extent membership is genuinely selective on some reasonable basis;

(2) measure of control the members have over the operations of the establishment;

(3) manner in which the membership corporation was created;

(4) purpose of the membership corporation existing;

(5) formalities which many private clubs observe; and

(6) general characteristics which many private clubs possess.

*Id.* at 375–377.

The core factors [from the list above] which determine whether an establishment "serves the public," or is "a private club or other establishment not in fact open to the public" are the extent to which the membership is genuinely selective on some reasonable basis, and the measure of control the members have over the operations of the establishment.

*Id.* at 376.

First, the Club does not follow a very selective membership policy even though it limits membership to eighty members. Only two white applicants have been rejected in the past fifty years, and they both had peculiar circumstances. One had violated Club policy as a guest by destroying club property during target practice and by overstaying the guest period of twenty-eight days per year. The second was a leader of the Jehovah's Witness Church and was in charge of racially integrating the local Johovah's Witness Church. No others were denied membership. Although the Club has formal membership requirements, it appears that the club follows "no plan or purpose of exclusiveness." *Sullivan v. Little Hunting Park*, 396 U.S. 229, 2326, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). Membership "is open to every white person within the geographic area, there being no selective element other than race." *Id.* Membership in the Club is limited to eighty members. Each applicant is investigated by the Membership Committee, who then makes a recommendation concerning the applicant. Next, the application is submitted to all the members for voting. It appears that the formal requirements prove that the Club is truly private. However, the Court is persuaded otherwise. Only two past white applicants were denied membership for special reasons, while Plaintiff's application was denied for tenuous reasons at best. As stated earlier, three board members voted "no" because Plaintiff would bring too many family members as guests. Others could not explain why they voted "no". "The formalities have little meaning when in fact the Club does not follow a selective membership policy." *Wright v. Salisbury Club*, 632 F.2d at 312.

Second, the members have little control over the operations of the establishment. The Defendant argues that by examining the Club's Charter and By-laws, the Court can find the Club intended to serve its members, not the general public. "The fact that the *modus vivendi* of the organization has been the same in the past years and is not a recently devised subterfuge to circumvent the 1964 Act is irrelevant." *Nesmith v. Young Men's Christian Association of Raleigh, North Carolina*, 397 F.2d at 102. The Club also had no control over the roads running through the Club property since Freestone County graded the Club's roads to be used to serve the public. By opening the Club's roads to the public, the Club is no longer private. *Cf. Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969).

### § 1981 and § 1982

Title 42 U.S.C. § 1981 provides for all U.S. citizens "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." The Court has previously found that Plaintiff was denied membership in the Club because he is black. The Club argues that even if the Court finds

that Plaintiff was denied membership because he is black, the Club is exempt from liability under § 1981 since it is a private club. As the court has already addressed the private club status of the Club, the Court is of the opinion that if such exemption is applicable to § 1981, the Court need not address the point since the Club is not a truly private club.

■ Title 42 U.S.C. § 1982 provides that all U.S. citizens have "the same right ... as is enjoyed by white citizens" to purchase, lease and hold real and personal property. Since the Court has already determined that Plaintiff was denied membership because he is black, the only issue remaining is whether the Club membership is "property" within the meaning of § 1982. *Wright v. Salisbury Club*, 632 F.2d at 314. In the present case, the Club owns the fee title interest in the property. A club member is entitled to make improvements on the lot designated or "leased" for that member's use by payment of yearly dues and membership fees. The member who makes the improvements owns such improvements and may sell them to a new member or may remove them upon termination of the membership. In the history of the Club, no member has ever removed an improvement. Most of the improvements are brick dwellings, which would not be cost efficient to remove. The Court is of the opinion that a shareholder member of the Club has a leasehold of realty coupled with a membership share in a nonprofit company organized to offer various recreational activities to members. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). In *Sullivan*, Little Hunting Park, a Virginia nonstock corporation, operated playground facilities and a community park for residents in Fairfax County, Virginia. Under the park bylaws, a member who rented a home could assign his or her membership to a tenant, subject to approval by the board of directors. A homeowner/member rented his home to a black tenant and assigned his membership share. The board refused to approve the assignment because the lessee was black.

The Court held in *Sullivan* that the right to assign a tenant park membership fell

within the meaning of § 1982. The property interest conveyed was a leasehold of realty coupled with a membership share in a park organized for the benefit of owners and lessees of real property in the residential area. *Id.* at 236, 90 S.Ct. at 404. The fact that the membership share does not convey the actual lot is not material since § 1982 covers both real and personal property. The Court in *Sullivan* also rejected Defendants' argument that there was no lease within the meaning of § 1982 by stating, "A narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1966, ... from which § 1982 was derived." *Id.* at 237, 90 S.Ct. at 404. This Court finds that the Club's denial of membership to Club and purchase of H.C. Daniel's share number 180, including use of a specific plot of land with the improvements on such land, was clearly an interference with Plaintiff's right to "lease" as specified in § 1982.

*Damages*

Finally, Plaintiff requests as damages injunctive relief, compensatory damages, including emotional distress and mental anguish, punitive damages, court costs and attorney's fees.

The Court finds that the Club is enjoined from denying Plaintiff membership in the Club. The Plaintiff may purchase membership share 180. Plaintiff is also awarded court costs and attorneys fees pursuant to 42 U.S.C. § 1988. Plaintiff's attorney shall file with the Court an application for attorney's fees within twenty (20) days of this opinion. Damages for emotional distress, mental anguish and punitive damages are denied.

Any Findings of Fact which should more properly be a conclusion of law is deemed to be so. Any Conclusion of Law which should more properly be a Finding of Fact is deemed to be so.