318

In the Matter of UNITED STATES POWER SQUADRONS, Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD, Respondent.

In the Matter of GREAT NECK POWER SQUADRON, INC., Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD, Respondent.

In the Matter of HEMPSTEAD BAY POWER SQUADRON, INC., Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD, Respondent.

In the Matter of WESTCHESTER POWER SQUADRON, INC., Petitioner, v STATE HUMAN RIGHTS APPEAL BOARD, Respondent.

Second Department, December 31, 1981

APPEARANCES OF COUNSEL

*Barry Golomb* and *Donald K. Barnes* for petitioners (separate briefs filed in each proceeding).

*Katherine Levitan* and *Steven R. Shapiro* for Charlotte P. Arutt, and another, complainants.

*Ann Thacher Anderson* (*Elaine Berger* of counsel), for State Division of Human Rights.

*Robert Abrams, Attorney-General* (*Sheila Abdus-Salaam, Shirley Adelson Siegel* and *Peter Bienstock* of counsel), intervenor *pro se.*

*Robert A. Yothers* for Conference of Private Organizations *amicus curiae.*

OPINION OF THE COURT

LAZER, J. P.

The issue here is sex discrimination; the activity is power-boating. Aggrieved by determinations of the State

Human Rights Appeal Board and the State Division of Human Rights that denial of membership and its privileges to women by three chapters of the United States Power Squadrons (USPS) constitutes unlawful discrimination under section 296 (subd 2, par [a]) of the Executive Law, the USPS and the three chapters seek annulment of the determinations. USPS is a nonprofit organization, among whose objectives are "to establish a high standard of skill in the handling and navigation of yachts; to encourage the study of the science of navigation and small boat handling; to co-operate with the agencies of the United States Government charged with the enforcement of the laws and regulations relating to navigation and to stimulate interest in activities which tend to the upbuilding of our Army, Navy, Coast Guard, and Merchant Marine." Each of the chapter petitioners — Hempstead Bay Power Squadron, Great Neck Power Squadron and Westchester Power Squadron — limits its membership to male citizens over the age of 18. The legal issue is whether membership and membership privileges in the petitioning Power Squadrons may be characterized as "accommodations, advantages, facilities or privileges" of "place[s] of public accommodation, resort or amusement" as defined in the Executive Law (§ 296, subd 2, par [a]). We find the characterization to be proper and conclude that confirmation is required.

In 1914, representatives of 20 yacht clubs formed the United States Power Squadrons as an organization intended to encourage skill and ability in the relatively new sport of motor boating. In 1920, USPS made organizational changes which it described as "the cornerstone of our strength." The changes mandated that each member was first to be deemed a member of USPS and then a member of his local squadron; membership was to consist "of any worthy man who passed the entrance examination (rather than being restricted to members of yacht clubs); and that USPS should stress nautical education and nothing else" (see United States Power Squadrons 1971 Officers' Manual, p 4). To realize these objectives, USPS, until 1975, mandated that each local chapter conduct a free basic boating course. The local chapters were permitted to open

the basic boating course to the public, including women, and could admit women to advanced courses conducted by the chapter, upon successful completion of the basic boating course. Most local chapters then permitted women to attend courses.

Each of the three petitioning chapters extended its basic boating course to the public and permitted women to take advanced courses upon successful completion of the basic boating course. However, certain advantages and privileges accrued solely to members. Because membership supposedly demonstrated a knowledge of boating, insurance carriers offered members discounts on boat insurance; members also received free admission to boat shows, discounts on nautical equipment, and could subscribe to USPS's official publication, *The Ensign,* at a discount. While USPS did not solicit subscriptions to *The Ensign* from the public at large, it did accept subscriptions from nonmembers at a higher nonmember's price. Another advantage of membership was the privilege of flying the USPS flag, which the organization described as "an outward and visible sign that the boat displaying it is under the charge of a capable person who has made a study of piloting and small boat handling and will recognize the rights of others and the traditions of the sea."

USPS urged its local chapters to recruit new members from the basic boating course. In its Procedural Manual for Membership Committees, the USPS membership committee instructed the local squadrons to give the enrollees of the basic boating course "indoctrination lectures" on the advantages of membership and to give enrollees "a broadly worded hint that 'a large percentage of the students may be invited to join'." An article entitled "Strike While the Iron is Hot" in the March, 1973 edition of *The Ensign,* urged that "the quicker you get the invitations [to membership] to the students, the better the response", and noted that "[s]ome squadrons actually are able to issue the invitations 'on the spot' within a few minutes after the student has completed his exam."

Consistent with this policy, the Great Neck Power Squadron extended membership invitations to nearly all of the men who passed the basic boating course. Bertha

Adler, a complainant in this case, completed the basic boating course in 1961, took advanced courses, and ultimately taught advanced courses. Nevertheless, she was denied membership in USPS and the Great Neck Power Squadron because she is a woman. On October 10, 1973, Mrs. Adler sent a letter to the Chief Commander of USPS and the Great Neck Power Squadron Commander stating that she wanted "to assume equal responsibility in USPS so that I, too, can promote Safe Boating" and deploring USPS's membership policies. She received no response.

Charlott Arutt, another complainant in this case, took the basic boating course conducted by the Hempstead Bay Power Squadron in 1965. She testified that the course proctors made "statements from time to time encouraging people to become members." Upon her successful completion of the course, Mrs. Arutt attended a ceremony where she observed several men from her class being inducted into membership. At that ceremony, she was informed that she could not take the membership pledge because she is a woman. In October, 1973 she reapplied for membership and was informed again that she was not eligible for membership because she is a woman.

The third complainant, Leslie Mayer, took the basic boating course offered by the Westchester Power Squadron in September, 1973. Both she and her husband successfully completed the course, but only her husband was invited to become a member of the Westchester Power Squadron.

Each of the complainants filed complaints with the State Division of Human Rights in June, 1974. USPS membership practices were also being challenged in New Jersey, where it was held that "denial of membership [to women] was an act of proscribed sex discrimination in violation of the public accommodation provision of *N.J.S.A.* 10:5-12(f)" (see *Hinden v United States Power Squadrons,* NJ Super Ct, App Div, June 18, 1975, Docket No. A3104073, petition for certification den 69 NJ 382, cert den 426 US 943). On June 1, 1973, the hearing examiner in the New Jersey case issued recommended findings of fact and conclusions of law to that effect. On September 9, 1973, USPS adopted new membership procedures and set forth, *inter alia,* the following general rules:

"A. Do not mention membership or any of its benefits or 'sell' USPS at any Boating Course class.

"B. Do not use the term 'recruit or recruitment' with respect to membership.

"C. Do not advertise or publicize USPS membership or its benefits in public relation activities, boat-shows, public events, etc. * * *

"E. *Divorce the invitation of prospective members from the boating class.* A minimum period of three weeks shall elapse after a boating class examination before any potentially desirable candidate is contacted in any manner, concerning possible membership in USPS, or any proposal for membership is submitted on his behalf."

At a meeting of the USPS operating committee on December 9, 1973, it was noted that "numerous letters have been received by the Membership Committee indicating that confusion exists over the new membership policies." On September 6, 1974, the operating committee discussed the "urgent" need to have "adequate material on membership policies that may be presented to the courts to defend the USPS position" in New York and formally adopted a "Statement of Membership Policy" which said that "the law prevents USPS members from discussing membership [in the basic boating course] lest solicitation of the students in such public classes be implied." Thereafter, the Commander of the Westchester Power Squadron noted, in the May-June, 1975 issue of *Current Set and Drift,* the Squadron's official publication: "Every member has been concerned and confused by the recent changes in membership procedures. Careful thought reveals that this is not a change of concept, but rather a more definitive method of assuring that each new member is an asset to the Squadron. This will aid in our desire to remain a 'private organization' and insure our ability to continue with our educational and social goals. Under the current program we have few restrictions in obtaining new members."

At the suggestion of its attorneys in the New Jersey proceedings, USPS discontinued its practice of inviting government officials to become honorary members and on May 5, 1974, the membership of government officials on

USPS's governing board was terminated. On November 3, 1974, the operating committee approved certain amendments to the USPS constitution to provide that one of the objectives of USPS was "to foster a fraternal and social relationship among its members" and that "social acceptance of the prospective member by the members of the Squadron" was a requirement for membership. Successful completion of the basic boating course was dropped as a membership requirement in January, 1975.

In May, 1975, the USPS closed its advanced courses to women who were not the wives or daughters of members. USPS also rescinded a rule which required each local squadron to conduct a basic boating course and, at some time prior to January, 1976, directed the New Jersey squadrons to discontinue the basic boating course entirely. These changes were apparently adopted in response to the instant proceedings and those in New Jersey challenging USPS's membership policies.

On May 31, 1979, the State Division of Human Rights, in three separate orders, held that USPS, Great Neck Power Squadron, Westchester Power Squadron and Hempstead Bay Power Squadron were the owners, lessees, proprietors or managers of places of public accommodation, resort or amusement, and that limitation of membership to males only was an unlawful discriminatory practice (see Executive Law, § 296, subd 2, par [a]). The State Human Rights Appeal Board annulled each of the orders and dismissed the complaints because the complaints had not been processed within the statutorily prescribed period.

On review, however, this court annulled the appeal board's orders and remitted the matters for determinations on the merits (see *Arutt v State Human Rights Appeal Bd.*, 74 AD2d 885). In three separate orders dated February 10, 1981, the appeal board then affirmed the decisions and orders of the State Division of Human Rights on the ground that those determinations were "supported by substantial evidence on the record taken as a whole".

### PETITIONERS' PROCEDURAL OBJECTIONS

■ Before dealing with the merits, petitioners allege certain procedural improprieties. USPS claims that the

Division of Human Rights never acquired in personam jurisdiction over it because (1) it was never served with process, and (2) it is a foreign corporation, separate and independent of the local squadrons in New York. Although CPLR 320 (subds [b], [c]) permits a defendant to contest a claim on the merits while preserving jurisdictional objections, this provision is applicable to "civil judicial proceedings" (see CPLR 101) and not to administrative proceedings before the Division of Human Rights. Thus, USPS waived its jurisdictional objections when it appeared before the Division of Human Rights, subpoenaed documents from the Division of Human Rights, and actively sought a favorable determination on the merits (see *Henderson v Henderson,* 247 NY 428, 433).

■ The USPS claim that it is not subject to long-arm jurisdiction because it is a foreign corporation separate and independent of the local squadrons in New York cannot withstand scrutiny. The Great Neck Power Squadron, Westchester Power Squadron, and Hempstead Bay Power Squadron each have passed resolutions in favor of admitting women to membership, but cannot do so, because all regular members of local squadrons must also be members of USPS and all by-laws adopted by local squadrons are subject to the approval of USPS's governing board. Therefore, USPS, by perpetuating discriminatory practices in this State, is subject to the in personam jurisdiction of the State Division of Human Rights (see *Matter of Walston & Co. v New York City Comm. on Human Rights,* 41 AD2d 238; cf. CPLR 302, subd [a], par 2).

■ USPS, the Great Neck Power Squadron, and the Hempstead Bay Power Squadron also contend that Charlotte Arutt and Bertha Adler's complaints were time barred by the one-year Statute of Limitations (Executive Law, § 297, subd 5), because these complainants were first denied membership in the 1960's. However, these petitioners admit that their practice of excluding women is of a continuing nature. It thus has a continuous impact on complainants and any women who are interested in, and otherwise eligible for, membership. Therefore, pursuant to 9 NYCRR 465.3 (e) which states that in the case of a discriminatory practice of a continuing nature "the date of

its occurrence shall be deemed to be any date subsequent to its inception, up to and including the date of its cessation", the period of limitation had not even started to run at the time the complaints were filed (see *Matter of Horn v New York State Human Rights Appeal Bd.,* 75 AD2d 978; *State Div. of Human Rights v University of Rochester,* 53 AD2d 1020; *Matter of Russell Sage Coll. v State Div. of Human Rights,* 45 AD2d 153, affd 36 NY2d 985). In any event, in October, 1973, less than one year before the complaints were filed, Mrs. Arutt and Mrs. Adler informed these petitioners that they still wanted to become members, and, predictably, their entreaties fell on deaf ears. Therefore, these complainants can point to specific acts of discrimination within the one-year period of limitation.

■ Finally, petitioners contend that they were deprived of a fair hearing because the Division of Human Rights did not comply with a subpoena duces tecum for all division determinations and opinions which interpret the meaning of "place of public accommodation" and because the appeal board did not adequately review the division's determinations in this case. These claims are also without merit. In compliance with the subpoena duces tecum, the division did forward certain opinions and memoranda to petitioners and invited petitioners to its premises to examine additional indices and case folders. Further, since the appeal board's scope of review is limited (see Executive Law, § 297-a, subd 7; *300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176), its determination that the division's detailed findings were "supported by substantial evidence" was sufficient to satisfy its obligations pursuant to subdivision 7 of section 297-a of the Executive Law.

#### THE MERITS

The petitioners' basic contentions are: (1) that they are associations with no fixed facilities and therefore cannot be considered "place[s] of public accommodation, resort or amusement"*; and (2) that they are "distinctly private" and therefore exempt from the provisions of the Human Rights Law.

---

* Petitioners do not claim that they are educational facilities specifically excluded from the definition of "places of public accommodation, resort or amusement" (see Executive Law, § 292, subd 9).

Subdivision 9 of section 292 of the Executive Law defines "place[s] of public accommodation" broadly (see *New York Roadrunners Club v State Div. of Human Rights,* 81 AD2d 519) to include a wide variety of terms which in and of themselves have broad meanings, e.g., "establishments dealing with goods or services of any kind". In *New York Roadrunners Club v State Div. of Human Rights (supra),* the New York City Marathon, which is hardly a fixed facility, was deemed a place of public accommodation.

In New Jersey, USPS's position has already been rejected in *Hinden v United States Power Squadrons (supra).* Consistent with *Hinden, National Organization For Women v Little League Baseball* (127 NJ Super 522, affd 67 NJ 320), held that the Little League was a "place of public accommodation". That decision (127 NJ Super, at p 531) noted that "[t]he statutory noun 'place' (of public accommodation) is a term of convenience, not of limitation."

Title 2 of the Civil Rights Act of 1964 (US Code, tit 42, § 2000a *et seq.*) does not define "place of public accommodation" as broadly as does the New York Human Rights Law (see Executive Law, § 292, subd 9) and only includes establishments whose "operations affect commerce, or if discrimination or segregation * * * is supported by State action" (US Code, tit 42, § 2000a, subd [b]). Nevertheless, the Federal courts have held that certain nonprofit organizations are places of public accommodation as defined in subdivision (b) of section 2000a of title 42 (see *Smith v Young Men's Christian Assn. of Montgomery,* 462 F2d 634; *Nesmith v Young Men's Christian Assn. of Raleigh,* 397 F2d 96; *United States v Slidell Youth Football Assn.,* 387 F Supp 474). The nonprofit organizations involved in those cases each operated facilities on a fixed piece of real estate.

New York's definition of "place of public accommodation, resort or amusement" includes "establishments dealing with goods or services of any kind" (see Executive Law, § 292, subd 9). Such establishments may be guilty of discriminatory practices by simply denying such services to particular individuals, without ever denying those individuals access to any particular place (see *Matter of Walston & Co. v New York City Comm. on Human Rights,* 41 AD2d 238, *supra*). Since all human activity must occur

at some particular location, "place" does not necessarily mean a fixed piece of real estate. It is unlikely that the Legislature, by using the word "place," intended to create a loophole on behalf of those establishments which do not own or lease real estate on a long-term basis. Therefore, the fact that an organization does not operate from a fixed piece of real estate is not determinative or necessarily relevant.

However, the question of whether each petitioner "is in its nature distinctly private" is determinative (see Executive Law, § 292, subd 9; *Kiwanis Club of Great Neck v Board of Trustees of Kiwanis Int.*, 41 NY2d 1034, affg 52 AD2d 906). Private organizations are exempt from the provisions of the Human Rights Law, and governmental control of such organizations may run afoul of the members' constitutional rights of privacy (see *Tillman v Wheaton-Haven Recreation Assn.*, 410 US 431, 438-439). A private club may be defined as: "(1) An organization which has permanent machinery established to carefully screen applicants for membership and who selects or rejects such applicants on any basis or no basis at all; (2) which limits the use of the facilities and the services of the organization strictly to members and bona fide guests of members in good standing; (3) which organization is controlled by the membership either in the form of general meetings or in some organizational form that would and does permit the members to select and elect those member officers who control and direct the organization; (4) which organization is non-profit and operated solely for the benefit and pleasure of the members; and (5) whose publicity, if any, is directed solely and only to members for their information and guidance" (see *Wright v Cork Club*, 315 F Supp 1143, 1153).

Petitioners clearly are bona fide clubs, controlled by the membership (see *Daniel v Paul*, 395 US 298; *United States v Richberg*, 398 F2d 523; *United States v Jordan*, 302 F Supp 370). However, petitioners' membership policies belie their contention that they are in fact *private* clubs. An organization which admits members based upon objective, and not subjective criteria, may not be considered a private club (see *Runyon v McCrary*, 427 US 160, 172, n 10). Where

new members must be approved by a "membership committee," the club may still be considered public if no applicant is ever rejected, other than applicants of the disfavored race or sex (see *Olzman v Lake Hills Swim Club,* 495 F2d 1333). If nearly everyone who applied for membership is accepted, the club may not be considered private (see *Smith v Young Men's Christian Assn. of Montgomery,* 462 F2d 634, *supra; Nesmith v Young Men's Christian Assn. of Raleigh,* 397 F2d 96, *supra; United States v Slidell Youth Football Assn.,* 387 F Supp 474, *supra*).

The evidence submitted at the hearing before the Division of Human Rights established that membership was based upon objective criteria and was open to "any worthy man who passed the entrance examination." There was also proof that the Great Neck Power Squadron, the Hempstead Bay Power Squadron, and the Westchester Power Squadron each solicited new members from the basic boating course, which was open to the public. In September, 1973, USPS, in order to create the appearance of a private club, directed all local squadrons to "[d]ivorce the invitation of prospective members from the boating class", but there was still confusion over the "recent changes in membership procedures" at least as late as May, 1975 when the Westchester Power Squadron's Commander noted that "[u]nder the current program we have few restrictions in obtaining new members."

Petitioners contend that the complainants bear the burden of proof that the private clubs, exemption is inapplicable. Since complainants did present substantial evidence that petitioners are not private clubs, the question of which party bears the burden of proof is not dispositive in this case. Nevertheless, we believe the burden of proof as to whether petitioners are private clubs should lie with petitioners (see *Anderson v Pass Christian Isles Golf Club,* 488 F2d 855, 857; *Nesmith v Young Men's Christian Assn. of Raleigh, supra,* p 101; *United States v Slidell Youth Football Assn., supra,* p 484), who are more familiar with their internal operations than complainants could ever hope to be. At the hearing, petitioners presented evidence in their behalf, e.g., that only a limited number of men who attended the basic boating course were admitted to member-

ship. However, since no records or statistics were kept on how many men who applied for membership were rejected, it was impossible to determine whether this was a reflection of restrictive membership policies or simply lack of interest in membership. Petitioners should not benefit from their failure to keep records or statistics as to how their membership policies worked in practice.

To establish that they do in fact fall within the private club exemption, petitioners rely on certain changes made in their organization and operation, apparently in direct response to the legal challenges to their discriminatory practices. These changes, which included (at least on paper) more restrictive membership policies, an amendment of USPS's constitution to provide that one of USPS's objectives was "to foster a fraternal and social relationship with its members," and adoption of an additional discriminatory practice, i.e., barring women who were not wives and daughters of members from advanced courses, bear all the earmarks of confession and avoidance. The Division of Human Rights held that "[t]here can be no avoidance of the Human Rights Law by changes made after a complaint is filed", but petitioners contend that their rights must be determined on the facts as they existed at the time of the hearing. However, when determining whether the private club exemption applies, changes in organization or operations are looked upon with suspicion. Even if the changes were effectuated prior to the initiation of the complaints, the private club exemption will not be applicable if the changes were insubstantial and effected in order to avoid the impact of civil rights legislation (see *Cornelius v Benevolent Protective Order of Elks,* 382 F Supp 1182, 1203; *United States v Jordan,* 302 F Supp 370, *supra*). The organization which purports to be a private club bears the burden of proving that the changes are genuine (see *United States v Richberg,* 398 F2d 523, 530, *supra*).

■ Here, the petitioners perpetrated unlawful discriminatory practices against complainants and they have not established that certain amendments to their constitutions and by-laws have resulted in significant changes in practice. Further, even if it were established that petitioners did make substantial changes in practice, there would still

be some question as to whether petitioners could be deemed clubs of a "distinctively private" nature because their long-standing members were recruited at a time when membership was open to the public. Therefore, petitioners' attempts to evade the impact of the Human Rights Law cannot succeed. Consequently, membership and the privileges in their organization may be characterized as "accommodations, advantages, facilities or privileges" of "place[s] of public accommodation, resort or amusement" which cannot be denied to women (see Executive Law, § 296, subd 2, par [a]).

Accordingly, the orders of the appeal board should be confirmed and the proceedings dismissed.

RABIN, COHALAN and BRACKEN, JJ., concur.

Orders of the State Human Rights Appeal Board, both dated February 10, 1981, confirmed and proceeding dismissed, without costs or disbursements.