■ In the Matter of MILL RIVER CLUB, INC., Petitioner, v NEW YORK STATE DIVISION OF HUMAN RIGHTS et al., Respondents. [873 NYS2d 167]—

Proceeding pursuant to Executive Law § 298 to review a determination of the Commissioner of the New York State Division of Human Rights dated December 26, 2006, which, after a hearing, found, inter alia, that the petitioner's membership admissions policy discriminated against applicants on the basis of creed in violation of Executive Law § 296 (2) (a).

Adjudged that the determination is confirmed, the petition is denied, and the proceeding is dismissed on the merits, with one bill of costs to the respondents appearing separately and filing separate briefs.

The petitioner Mill River Club, Inc. (hereinafter the club) is a not-for-profit corporation which operates a country club in Oyster Bay. The club offers its members various amenities, including a golf course, swimming pool, tennis courts, and a club house for dining and hosting social functions. It is undisputed that since its founding in 1964, the club has maintained a "balanced membership policy," whereby it seeks to ensure that half of its members are of the Jewish faith, and half are Christians. To this end, the club admits applicants to membership only when a space opens up for a person of his or her religion, which can result in an otherwise acceptable applicant waiting as long as five or six years for membership.

In October 2002 club member Joseph Pezza filed a complaint with the New York State Division of Human Rights (hereinafter

the SDHR), alleging that the club's practice of enforcing a religious quota system for applicants violated the Human Rights Law (Executive Law art 15), which, inter alia, prohibits discrimination by a place of public accommodation "because of . . . creed" (Executive Law § 296 [2] [a]). In its answer, the club claimed that it was not subject to the provisions of the Human Rights Law because it was a "distinctly private" organization within the meaning of Executive Law § 292 (9). The club also contended that Pezza lacked standing to challenge its admissions policy, and that the relief sought by him would violate the constitutional rights of other club members.

At an administrative hearing conducted in July 2005 Pezza testified that, in accordance with the club's membership policy, every member of the club was labeled as "J" for Jewish, "C" for Christian, "M" if part of a couple of mixed religious faith, or "O" for other. Those labeled "M" or "O" were counted as Christians for purposes of determining the religious composition of the club's membership. In order to maintain a 50% Jewish and 50% Christian membership, applicants would have to wait for a space to open up for a person of his or her religious denomination, which could result in being placed on a waiting list for a significant period of time. The club has also sought to maintain its balanced membership by lowering the initiation fee for one group or the other in order to attract members of the sought-after religious community. Pezza further testified that the religious quota system also applied to individuals who were "house members" and wanted to upgrade to full membership in the club, and that one such member had complained of initiation fees increasing while he waited for full membership slots to open up for those of his religious denomination. According to Pezza, placing prospective members on a waiting list harmed all members financially, because it delayed payment of initiation fees and membership dues which would provide the club with revenue, and lower or eliminate the need to assess existing members to close revenue gaps. Pezza also testified that the club's policy embarrassed him because "it puts unnecessary labels on people."

A number of other club members also gave testimony relevant to the issue of whether the club was a distinctly private organization outside of the scope of the Human Rights Law. The testimony of these witnesses indicated that the club has between 300 and 400 members in various membership categories. In order to join the club, an applicant must, inter alia, be sponsored by an existing member, undergo a background check, have dinner with a member of the Admissions Committee, and

be interviewed by members of the full Admissions Committee. Members of the club are permitted to invite nonmembers to use its dining and recreational facilities as guests, and may sponsor events for nonmembers. Members have sponsored a variety of social events for nonmembers, including weddings, birthday parties, anniversary parties, and bridal or baby showers. Members have also sponsored golf and tennis outings to raise money for a variety of nonmember institutions, including the Girl Scouts, the Coalition Against Child Abuse and Neglect, and the State University of New York at Farmingdale. On one occasion, a former club president sponsored a fund-raiser for a local politician. Nonmembers pay the club directly for the cost of these events, and the club provides services such as food, alcohol, and wait-staff. The club earned the sum of $264,043.07 in revenue from nonmember events in 2002, $265,854.17 in 2003, and $196,885.78 in 2004.

The evidence presented at the hearing also reveals that the club employs golf and tennis professionals to give lessons, and that both members and nonmembers are permitted to take lessons from these individuals. In addition, the club earns revenue from golf and tennis shops on its premises which sell equipment and clothing, and are open to members and nonmembers alike.

On August 7, 2007 the administrative law judge (hereinafter ALJ) who had presided over the hearing issued findings of fact and a recommended order. Although the ALJ found that Pezza did not have standing to file a discrimination complaint against the club since he had not been denied membership, the ALJ concluded that the SDHR had standing to commence the proceeding on its own behalf since it had been granted broad police powers to protect against unlawful discrimination. The ALJ also found that the club was a place of public accommodation subject to the Human Rights Law, and that its balanced membership policy constituted a violation of that statute.

In a final order dated December 26, 2006 the Commissioner of the SDHR (hereinafter the Commissioner) rejected the ALJ's finding that Pezza did not have standing, concluding that Pezza did indeed have standing because he had been subjected to a discriminatory policy of being labeled on the basis of creed. The Commissioner also concluded that the club was a place of public accommodation as defined by the Human Rights Law, and was not a "distinctly private" organization (Executive Law § 292 [9]) exempt from the anti-discrimination provisions of that statute. The Commissioner further noted that, although the club's goal was to create an environment free from religious prejudice, its balanced membership policy violated the Human Rights Law

since it excluded some potential members, favored other members, and offered discounted fees based solely upon an applicant's creed. The Commissioner ordered the club to evaluate applicants for membership without discrimination on the basis of creed, and to grant membership to all persons without regard to creed. The club subsequently commenced this proceeding, seeking to review the Commissioner's determination, and the matter was transferred to this Court pursuant to CPLR 7804 (g).

Judicial review of an administrative determination made after a hearing required by law, and at which evidence was taken, is limited to whether the determination is supported by substantial evidence (*see 300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 179 [1978]; *Matter of Venditti v New York State Dept. of Envtl. Conservation*, 57 AD3d 685 [2008]; *Matter of Genovese Drug Stores, Inc. v Harper*, 49 AD3d 735 [2008]; *Matter of Sauer v Donaldson*, 49 AD3d 656 [2008]). "In the final analysis, it is not the function of the reviewing court to weigh the evidence or substitute its own judgment for that of an administrative body to whose expertise a subject matter has been entrusted, but rather to determine whether there is a 'reasonable fulcrum of support in the record' to sustain the body's findings" (*Matter of Bradley Corporate Park v Crotty*, 39 AD3d 632, 634 [2007], quoting *Matter of Furey v County of Suffolk*, 105 AD2d 41, 43 [1984]).

Contrary to the club's contention, there is substantial evidence in the record to support the Commissioner's findings. In the first instance, an individual has standing to seek administrative or legal redress for a statutory violation where he or she has suffered an injury, and falls within a zone of interest that the statute protects (*see Matter of Town of Riverhead v New York State Dept. of Envtl. Conservation*, 50 AD3d 811, 813 [2008]; *Dunn v Fishbein*, 123 AD2d 659, 660 [1986]). Although Pezza was not himself denied membership in the club based upon his religion, his testimony at the hearing demonstrated that he was deprived of the associational benefit of interacting with at least two potential members who were placed on the waiting list because there were no available openings for members of their religion. Pezza also testified that placing otherwise acceptable applicants on the waiting list deprived the club of revenues, potentially necessitating assessments to close revenue gaps, and that the policy of labeling applicants and members based upon their religion embarrassed and humiliated him. This evidence was sufficient to demonstrate that Pezza suffered cognizable harm as a result of a discriminatory admis-

sions policy, which is within the zone of interest protected by the Human Rights Law (*see United States v Students Challenging Regulatory Agency Procedures [SCRAP]*, 412 US 669, 689 n 14 [1973]; *Trafficante v Metropolitan Life Ins. Co.*, 409 US 205 [1972]; *Estate of Morris ex rel. Morris v Dapolito*, 297 F Supp 2d 680, 690 [2004]; *Puglisi v Underhill Park Taxpayer Assn.*, 947 F Supp 673, 688 [1996], *affd* 125 F3d 844 [1997]; *Dunn v Fishbein*, 123 AD2d at 660).

The Commissioner's finding that the club is a place of public accommodation, and does not fall within the "distinctly private" exception to the Human Rights Law, as articulated in Executive Law § 292 (9), is similarly supported by substantial evidence. The Human Rights Law defines a place of public accommodation to include facilities operated by the club, such as golf courses, swimming pools, and restaurants (*see* Executive Law § 296 [2] [a]). As amended in 1994, the statute also provides that "[i]n no event shall an institution, club, or place of public accommodation be considered distinctly private in its nature if it has more than one hundred members, provides regular meal service and regularly receives payment . . . directly or indirectly from or on behalf of a nonmember for the furtherance of trade or business" (Executive Law § 292 [9]). The evidence presented at the hearing clearly demonstrates that the club has more than 100 members, and provides regular meal service. The evidence also shows that nonmember individuals and institutions paid the club directly for use of its facilities, and that the club was essentially providing commercial catering services in hosting nonmember events, which generated significant revenue. In addition, the club allowed its recreational facilities to be used by nonmembers who purchased golf and tennis instruction, and nonmembers were free to purchase goods from its pro golf and tennis shops. Moreover, the social events and charitable and political fund-raisers held by nonmembers can be viewed as furthering trade or business since such events at a country club allow "personal contacts valuable for business purposes, employment and professional advancement" to be formed (*see New York State Club Assn., Inc. v City of New York*, 487 US 1, 6 [1988] [internal quotation marks omitted]).

Furthermore, it is clear from the legislative history underlying the 1994 amendment of Executive Law § 292 (9) that the three identified characteristics that preclude a club from being accorded "distinctly private" status were intended to be illustrative rather than exhaustive. Legislative history reveals an intent that clubs not be permitted "to evade prosecution under antidiscrimination laws by hiding behind a 'private club' label"

where they "earn revenues by allowing non-members to partially utilize their clubs through such activities as weddings, business outings, etc.," and regularly receive funds from nonmembers for use of their facilities (*see* Sponsor's Mem, Bill Jacket, L 1994, ch 262, at 10). Despite the fact that the club exercises selectivity in choosing its members and requires member sponsorship of nonmember events, it nevertheless regularly allows nonmembers to utilize its facilities and generates revenue thereby. Given the extent to which the club generates revenue from providing services to nonmembers, it would be inconsistent with the purpose and intent of the Human Rights Law to afford it "distinctly private" status and exempt it from the anti-discrimination provisions of the statute.

Substantial evidence also supports the Commissioner's determination that the club violated the Human Rights Law by using a religious quota system to admit new members. While the club's goal in implementing such a quota system was to promote diversity, the admissions policy had a discriminatory impact because it resulted in the denial of membership benefits to individuals who were placed on the waiting for substantial periods of time based solely upon their religion (*see United States v Starrett City Assoc.*, 840 F2d 1096 [1988], *cert denied* 488 US 946 [1988]).

Furthermore, we find no merit to the club's contention that the remedy directed by the Commissioner violates the First Amendment rights of its existing members to private association and expressive association. Even if we were to accept the club's position that it is a "private association" and "expressive association" in which its members have joined to express their belief in promoting religious diversity, the Commissioner's remedy does not violate these rights to associational freedom because it is narrowly tailored to serve a compelling state interest in preventing discrimination on the basis of religion (*see Roberts v United States Jaycees*, 468 US 609, 623 [1984]). The remedy ordered by the Commissioner requires the club to evaluate applicants for membership without discrimination on the basis of creed, and to grant membership to all persons without regard to creed. This remedy does not violate the rights of existing club members to private association because it does not prevent the club from excluding applicants who do not subscribe to its goal of religious diversity in its membership, or to expressive association because it does not prohibit the club from advocating its viewpoint that a religiously diverse membership is vital. Although the Commissioner's remedy compels access to the benefit of membership without reference to religion, it does

not trespass on the organization's message of religious diversity itself (*see Hurley v Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 US 557, 580 [1995]; *New York State Club Assoc., Inc. v City of New York*, 487 US at 12-13).

Finally, we reject the club's contention that the remedy directed by the Commissioner has been rendered academic by virtue of changes in its policies that it implemented after the hearing to bring it within the ambit of a "distinctly private" accommodation that is exempt from the Human Rights Law. Since these alleged policy changes were implemented after the hearing, they are dehors the record and we have no assurance that they are genuine (*see Matter of United States Power Squadrons v State Human Rights Appeal Bd.*, 84 AD2d 318, 330 [1981], *affd* 59 NY2d 401 [1983]). Mastro, J.P., Angiolillo, Carni and Eng, JJ., concur.